UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
JAMES RISCH,

                                     Plaintiff,

       -v-                                              9:09-CV-330

SUPERINTENDENT WILLIAM HULIHAN;
NEW YORK STATE DEPARTMENT OF
CORRECTIONAL SERVICES; CENTRAL
NEW YORK PSYCHIATRIC CENTER;
COMMISSIONER MICHAEL HOGAN; DR.
SUBBARAO RAMINENI; DR. VENRRATA R.
MANNAVA; DR. FARAGO; CYNTHIA CHAPPLE;
KAREN TOURTELOT; COURTNEY CHEYNE;
and CYNTHIA HOWARD,

                                  Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                            OF COUNSEL:

JAMES RISCH
Plaintiff, Pro Se
03-B-0692
Elmira Correctional Facility
P.O. Box 500
Elmira, NY 14902

HON. ANDREW M. CUOMO              MICHAEL G. MCCARTIN, ESQ.
Attorney General of the                 Asst. Attorney General
   State of New York
Attorney for the Defendants
Department of Law
The Capitol
Albany, NY 12224

DAVID N. HURD
United States District Judge

**MEMORANDUM-DECISION and ORDER**

## I. INTRODUCTION

Plaintiff James Risch ("plaintiff" or "Risch"), a New York state prison inmate proceeding pro se and in forma pauperis, commenced this action on March 23, 2009, pursuant to 42 U.S.C. § 1983 and alleges that defendants were deliberately indifferent to his medical and mental health needs in violation of the Eighth Amendment. Plaintiff asserts that defendants' indifference is in retaliation for his filing of grievances and in an effort to save public funds. Plaintiff seeks declaratory, injunctive, and monetary relief. On June 11, 2010, defendants moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Defendants claim that Risch received sufficient medical and mental health treatment and assert a defense of qualified immunity. Moreover, defendants Hulihan, Hogan, and Chapple argue that they were not personally involved in the conduct that allegedly deprived plaintiff of his constitutional rights.

Plaintiff's response in opposition to defendant's motion fails to mirror defendants' statement of material facts and does not include a formal memorandum of law.[1] Instead, plaintiff filed an affidavit reasserting his claim that defendants failed to properly treat his medical condition and cut off his mental health medication and treatment entirely. Risch also requests that his deposition testimony be stricken because he had not taken his mental health medication for two days prior to that proceeding.

---

[1] Plaintiff's failure to respond in strict adherence to Local Rule 7.1 is not fatal to his claim. It is clear from Risch's papers that facts are contested. Courts often attempt to find some parity between the moving and opposing documents when a pro se party is involved. See Johnson v. Connolly, No. 9:07-CV-1237, 2010 WL 2628747, at *2 (N.D.N.Y. June 25, 2010) (McAvoy, J.); Brown v. Artus, 647 F. Supp. 2d 190, 199 (N.D.N.Y. 2009) (Peebles, M.J.). Therefore, the facts and inferences will be gleaned from plaintiff's complaint, deposition testimony, affidavit in opposition, and other pertinent documents in the record.

## II. **FACTUAL BACKGROUND**

Plaintiff was housed in Mid-State Correctional Facility ("Mid-State") at all times relevant to this action.[2]  Plaintiff began experiencing urinary tract and prostate problems in early 2006.  He sought treatment from Dr. Ramineni and Dr. Mannava, who prescribed medication and performed a variety of tests including urinalysis, a venereal disease test, and a prostate ultrasound.  In late 2006 or early 2007 plaintiff was sent to an outside urologist, Dr. Haas, who prescribed antibiotics and ordered a testicular ultrasound.  Plaintiff saw Dr. Haas four times, the most recent of which was February 2009 when he was prescribed Neurontin for pain.  Plaintiff was placed on another antibiotic in March 2009.

Plaintiff filed a grievance on January 17, 2007, alleging that defendants Howard, Mannava, and Ramineni failed to properly treat his urinary tract condition.  Plaintiff claims that he appealed the response to the Central Office Review Committee, who "denied" it. Although Risch claims that this was one of "many" formal complaints and grievances, he does not provide details about any others.

It is undisputed that Risch has a history of mental illness and was diagnosed with bipolar disorder prior to his transfer to Mid-State.  Plaintiff noted that he has had suicidal thoughts everyday since the age of 16 and attempted suicide three times—once in the 1980s, once in the 1990s, and once in 2002.  In May 2006, during his transition from Livingston Correctional Facility to Mid-State, plaintiff experienced mood swings, irritability, racing thoughts, panic attacks, and symptoms of anxiety and bipolar disorders.  At that time he was "medically unassigned"—removed from programming—due to his mental health

---

[2] Plaintiff resided at Mid-State from May 2006 to June 2009 and currently resides at Elmira Correctional Facility.

condition.  On June 6, 2006, after arriving at Mid-State, defendants Tourtelot and Farago changed his primary diagnosis from bipolar disorder to alcohol dependence, cocaine abuse, and personality disorder with antisocial traits.  Plaintiff was prescribed Strattera (for attention deficit disorder), Risperdal (antipsychotic), and Effexor (antidepressant) and was made to engage in "talk therapy" every three weeks with defendant Cheyne.

Plaintiff admits that in June 2007 he was caught with another inmate's prescription medication.  As a result, defendant Tourtelot immediately took plaintiff off all mental health prescription medications, but his therapy sessions continued.  Plaintiff was therefore not prescribed any mental health medication from June 2007 until approximately December 2009 when he was put on Zyprexa, Celexa, and Lamictal.  He claims that being taken off Effexor allowed his urinary tract infection to clear up but caused him to slip into a severe depression.

## III.  DISCUSSION

### A.  Summary Judgment Standard

The entry of summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 2509–10 (1986).  A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law."  Anderson, 477 U.S. at 248, 106 S. Ct. at 2510; see also Jeffreys v. City of New York, 426 F.3d 549, 553 (2d Cir. 2005).  A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248, 106 S. Ct. at 2510.

When summary judgment is sought, the moving party bears the initial burden of demonstrating that there is no genuine issue of material fact to be decided with respect to any essential element of the claim.  <u>Anderson</u>, 477 U.S. at 250 n.4, 106 S. Ct. at 2511 n.4. The failure to meet this burden warrants denial of the motion.  <u>Id</u>.  In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial.  <u>Id</u>. at 250, 106 S. Ct. at 2511; Fed. R. Civ. P. 56(e).

When deciding a summary judgment motion, a court must resolve any ambiguities and draw all inferences from the facts in a light most favorable to the nonmoving party. <u>Jeffreys</u>, 426 F.3d at 553.  Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." <u>Treglia v. Town of Manlius</u>, 313 F.3d 713, 719 (2d Cir. 2002) (citation omitted); <u>see</u> <u>also</u> <u>Anderson</u>, 477 U.S. at 250, 106 S. Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

### B. <u>Deposition Testimony</u>

Plaintiff asserts that his deposition testimony should be stricken because he did not take certain medications for two days prior to the deposition proceeding.  Specifically, Risch claims that he did not take his Celexa (antidepressant), Lamictal (mood stabilizer), and Zyprexa (antipsychotic).  However, plaintiff does not allege that he was incoherent at any time during the deposition.  There is nothing in the record to suggest that plaintiff was unable to fully and truthfully answer the questions posed to him.  Moreover, the Assistant Attorney General conducting the deposition was aware that Risch had not taken his medication and repeatedly asked if he was prepared to proceed.  At the beginning of the deposition the following exchange took place between the Assistant Attorney General and Risch:

Q: Now, we talked before going on the record about whether or not you felt that you would be able to participate coherently in the deposition process. Do you feel you are able to do that despite the fact that you haven't had these three medications over the past two days?

A: I would like to get this over with.

Q: Let me ask you: Are you able to understand my questions?

A: I can understand what's going on.

Q: Are you able to think coherently about the issues involved in your lawsuit?

A: Yes.

Q: And are you able to answer the questions that I am here to depose to you during the course of this deposition?

A: Let's see how it goes.

Q: Okay. If during the course of the deposition you feel that as a result of not having these particular medications you don't understand the questions or aren't able to think coherently, would you identify or stop me during the course of the deposition so we could talk about that?

A: Yes.

Q: Would you agree at this point that if we are able to get through the entire deposition without you stopping and telling me, "Hey, I just can't continue," that anyone who would review this deposition in the future would be able to conclude properly that you were able to answer the questions, is that an agreement we can reach?

A: Yes.

McCartin Dec., Ex. A, Dkt. No. 54–3, at 7–8 ("Plaintiff's Depo."). At the end of the deposition, which lasted approximately two hours, the following exchange took place:

Q: Do you feel like your mood is pretty stable today?

A. I am more irritable than anything else, and uncomfortable. I have been moving around too much for the past month. I haven't been able to get settled.

> Q:  So my question to you is despite the fact that you have not been on your medications for the last two days, do you feel like you were adequately able to respond to questions put to you during the course of this deposition?
>
> A:  Yes.  I did my best.  I am extremely uncomfortable.
>
> Q:  Does your best mean that you were logical and coherent?
>
> A:  Yes, I am lucid.

Id. at 76–77.

Given the above, plaintiff's assertion that his ability to answer the questions posed by the Assistant Attorney General was "seriously impaired" is without merit.  Risch was provided ample opportunity to make his concerns known at the deposition or even to postpone the proceeding.  Further, a review of the deposition transcript shows that Risch provided coherent, responsive answers.  He was able to easily recall dates, diagnoses, medications, and doctors' names.  Accordingly, plaintiff's request to have the deposition testimony stricken will be denied.

### C.  Personal Involvement

The personal involvement of defendants is an essential element of a section 1983 claim.  Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994).  Further, "[a] plaintiff must allege a tangible connection between the acts of a defendant and the injuries suffered."  Bass v. Jackson, 790 F.2d 260, 263 (2d Cir. 1986).  It has been established that "[a] supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor; there is no *respondeat superior* liability under section 1983."  Groves v. New York, No. 9:09-CV-412, 2010 WL 1257858, at *12 (N.D.N.Y.) (Peebles, M.J.) (citing Richardson v. Goord, 347 F.3d 431, 435 (2d Cir. 2003)) Report & Recommendation adopted, 2010 WL 1257942 (N.D.N.Y. Mar. 26, 2010) (Sharpe, J.).  The "mere linkage in the prison chain of command" is

insufficient to implicate prison administrators.  Richardson, 347 F.3d at 435 (quoting Ayers v. Coughlin, 780 F.2d 205, 210 (2d Cir. 2003)).  In Groves, the court noted that "[e]ven if the plaintiff is alleging that defendants . . . are responsible for the training, supervision, discipline, or control of the staff at CNYPC, without more, these allegations are insufficient to establish personal involvement."  Groves, 2010 WL 1257858, at *13.

However, a supervisor may be held liable under section 1983 by one or more of the following:  (1) direct participation in the constitutional deprivation; (2) failure to remedy a wrong after learning about it through a report or appeal; (3) creation of a policy that sanctioned the violative conduct or allowed such conduct to continue; (4) grossly negligent supervision of personnel who committed the violation; or (5) failure to act after receiving information indicating that constitutional violations were occurring.  Colon v. Coughlin, 58 F.3d 864, 873 (2d Cir. 1995).

Whether all five Colon bases for supervisor liability remain available in light of the Supreme Court's decision in Ashcroft v. Iqbal, __ U.S. __, 129 S. Ct. 1937, 1948–49 (2009), has been debated by the district courts.  See, e.g., McCarroll v. Fed. Bureau of Prisons, No. 9:08-CV-1343, 2010 WL 4609379, at *4 (N.D.N.Y. Sept. 30, 2010) (Lowe, M.J.) (noting that although the Second Circuit has not yet addressed Iqbal's impact on the five Colon categories, several district courts have determined that it "nullified" some); D'Olimpio v. Crisafi, 718 F. Supp. 2d 340, 347 (S.D.N.Y. 2010) (citing, but disagreeing with, several recent decisions that interpreted Iqbal as eliminating all but the first and third Colon categories).

Even if all five bases of supervisory liability survived Iqbal, plaintiff has failed to allege sufficient personal involvement on the part of defendants Hulihan, Hogan, and Chapple.  Plaintiff makes conclusory allegations in his complaint that these defendants knew

of and acquiesced to his diagnoses and treatment.  However, there is nothing in the record to suggest that any of these defendants were aware of any alleged conduct that violated plaintiff's constitutional rights, were grossly negligent in their supervision of the prison staff involved, or directly participated in or created a policy that condoned violative conduct.

In his deposition, plaintiff acknowledged that the only reason he named defendant Hulihan, Superintendent of Mid-State, was because he was at the top of the chain of command.  Plaintiff's Depo., at 11.  Plaintiff advised that he included Commissioner Hogan in the suit simply because he is the director of the Office of Mental Health.  Id.  Similarly, Risch claimed that he sued defendant Chapple, Unit Chief at Mid-State, "[b]ecause she is pretty much the boss at the mental health unit.  The same reason I listed Hulihan as a defendant." Id. at 36.  Plaintiff claimed that although he wrote letters to defendants Hogan and Chapple, he never had any direct contact with them or Hulihan.  Id. at 12–13, 36–37.  This is insufficient to establish personal involvement on the part of these defendants.  See Goris v. Breslin, No. 10-0491-pr, 2010 WL 4840482, at *1 (2d Cir. Nov. 30, 2010) (receipt of two letters from an inmate does not constitute personal involvement); Groves, 2010 WL 1257858, at *13 (sending letters of concern to an administrator is insufficient to establish personal involvement).

Accordingly, defendants Hulihan, Hogan, and Chapple will be dismissed from this action.

### D.  Deliberate Indifference

Claims that prison officials have disregarded an inmate's medical needs fall under the umbrella of protection from the imposition of cruel and unusual punishment afforded by the Eighth Amendment.  Estelle v. Gamble, 429 U.S. 97, 104, 97 S. Ct. 285, 291 (1976).

While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement. <u>Farmer v. Brennan</u>, 511 U.S. 825, 832, 114 S. Ct. 1970, 1976 (1994) (citing <u>Rhodes v. Chapman</u>, 452 U.S. 337, 349, 101 S. Ct. 2392, 2400 (1981)). Prison officials must "ensure that inmates receive adequate food, shelter, and medical care, and must take reasonable measures to guarantee the safety of inmates." <u>Id</u>. (quoting <u>Hudson v. Palmer</u>, 468 U.S. 517, 526–27, 104 S. Ct. 3194, 3200 (1984)).

It is well-established that mere disagreement over diagnosis and treatment does not subject the involved prison officials to liability. <u>Chance v. Armstrong</u>, 143 F.3d 698, 703 (2d Cir. 1998). To show that the medical treatment of a prisoner violated the Eighth Amendment, a plaintiff must prove that the defendants' acts or omissions constituted "deliberate indifference to serious medical needs." <u>Estelle</u>, 429 U.S. at 106, 97 S. Ct. at 292. Mental illness can constitute a serious medical need. <u>Langley v. Coughlin</u>, 888 F.2d 252, 254 (2d Cir. 1989). To satisfy this standard, a plaintiff must establish both an objective and subjective element. <u>Helling v. McKinney</u>, 509 U.S. 25, 35, 113 S. Ct. 2475, 2481 (1993).

Under the objective prong, it must be shown that the alleged deprivation of medical treatment was "sufficiently serious"—meaning a condition of urgency that may produce death, degeneration, or extreme pain. <u>Johnson v. Wright</u>, 412 F.3d 398, 403 (2d Cir. 2005) (citing <u>Hemmings v. Gorczyk</u>, 134 F.3d 104, 108 (2d Cir. 1998)). This involves two separate inquiries. <u>Salahuddin v. Goord</u>, 467 F.3d 263, 279 (2d Cir. 2006). First, it must be asked whether plaintiff was actually deprived of adequate medical care. <u>Id</u>. If the prison officials acted reasonably with regard to plaintiff's health risk, they cannot be held liable for an Eighth Amendment violation. <u>Id</u>. Second, it must be determined whether the inadequacy in medical care was "sufficiently serious." <u>Id</u>. at 280. Where, as here, the alleged inadequacy is in the

treatment provided, the seriousness inquiry is narrow and focuses on the delayed or deficient treatment rather than on the prisoner's underlying condition alone.  Id.

Under the subjective prong, the plaintiff must prove that the defendants acted with a "sufficiently culpable state of mind."  Johnson, 412 F.3d at 403 (quoting Chance, 143 F.3d at 702).  This requires proof that the defendants knew of and disregarded an excessive risk to the plaintiff's health or safety.  Id.; see Farmer, 511 U.S. at 839–40, 114 S. Ct. at 1980 (noting that this standard is analogous to criminal recklessness).

### 1.  Mental Health Needs

It is undisputed that plaintiff met with mental health professionals on a regular basis throughout his stay at Mid-State.  However, plaintiff argues that the treatment he received was inadequate.  He specifically asserts that defendants Farago, Tourtelot, and Cheyne were deliberately indifferent to his mental health needs by failing to diagnose him with bipolar disorder and by taking him off all mental health prescription medications from June 2007 until December 2009.

Objective Element

Defendants argue that plaintiff was taken off all mental health medications in June 2007 for his own safety because he was mixing his prescription medications with those of another inmate.  Defendants claim that this, coupled with continued therapy sessions, was reasonable treatment for plaintiff's condition and therefore should not subject them to constitutional liability.  Moreover, defendants assert that plaintiff's mental health condition during this time was not sufficiently serious for purposes of his deliberate indifference claim.

It is undisputed that mixing prescription medications subjected plaintiff to a clear risk of harm.  See Plaintiff's Depo., at 46 (plaintiff acknowledges that it is "common sense" that mixing prescription medications can be lethal).  However, whether it was "reasonable" to respond by abruptly taking Risch, who has attempted suicide three times in the past, off all mental health medications is inappropriate to decide at the summary judgment stage.  The issue is therefore whether any inadequacy in treatment was "sufficiently serious" in light of plaintiff's condition.

In order to establish that the inadequacy of treatment was sufficiently serious Risch must put forth evidence showing that his condition was negatively impacted by the defendants' diagnosis and decision to take him off medications.  See R.T. v. Gross, 298 F. Supp. 2d 289, 296 (N.D.N.Y. 2003) (McAvoy, J.) ("Because Plaintiff has not submitted any verifiable evidence indicating that a failure to treat his [bipolar disorder] adversely affected his prognosis, he cannot be said to have had a serious medical need.").

During a July 21, 2008, session with plaintiff, defendant Cheyne noted that while he expressed a need for medication "he has been functioning well off of medication since 06/07. There have been no reported problems per pt and no reported problems per staff."  Cheyne Dec., Ex. D, Dkt. No. 54–15.  This report also indicates that plaintiff sought medication "for substance abuse addiction" and denied experiencing any suicidal ideation, psychosis, depression, anxiety, mood swings, or problems eating or sleeping.  Id.

Plaintiff again met with defendant Cheyne on October 16, 2008.  Cheyne Dec., Ex. E, Dkt. No. 54–16.  He requested medications "for his chemical dependency concerns" and mood swings.  Id.  Cheyne indicated that plaintiff had "no documented episodes of mania

since his medications were discontinued on 06/25/2007." Id.  Further, Risch reported that he had "almost no anxiety now" and again denied any suicidal ideation, psychosis, depression, or problems eating or sleeping. Id.  On February 17, 2009, plaintiff advised defendant Cheyne that he was experiencing symptoms of depression due to his ongoing urinary and prostate concerns.  Cheyne Dec., Ex. A, Dkt. No. 54–12.

When confronted with these repeated denials of symptoms, Risch explained that he did not disclose his suicidal thoughts because "if you tell them you are going to kill yourself, all they do is lock you up in a room, and they don't do a damn thing about it." Plaintiff's Depo., at 64.  Plaintiff claimed that he did not feel comfortable speaking openly with defendant Cheyne and stated that "talk therapy doesn't do any good." Id. at 66.  In his complaint, plaintiff claims that he was removed from the general population on January 8, 2009, due to suicidal ideation and was examined by defendant Farago.  Complaint, Dkt. No. 1, ¶¶ 59–60.  However, such an incident was neither discussed at his deposition nor mentioned in any other document in the record.

At his deposition, plaintiff reported that in April 2009 he had a therapy session with defendant Cheyne in which he discussed numerous "weird thoughts" he had been having and expressed his concern that he did not know the origin of these thoughts.  Plaintiff's Depo., at 65.  Plaintiff also claimed that he sought therapy in September or October of 2009 because he was having trouble controlling his anger after someone stole money from his account. Id. at 68.  At that time, plaintiff was placed in an observation cell for eight to ten hours in order to monitor his mental health and behavior. Id. at 68–69.

Viewing these facts in the light most favorable to the plaintiff, there is sufficient evidence for a reasonable finder of fact to conclude that he suffered from a sufficiently serious condition.  Plaintiff claimed to have thought about suicide daily but did not disclose this ideation because he feared being locked up in an isolated room.  In 2009, Risch reported symptoms of depression in February, experienced strange racing thoughts in April, and had anger management problems in the fall.  Considering these facts in combination with his significant history of mental health problems, suicide attempts, and the abrupt discontinuance of mental health medications could lead to a finding that his condition was serious.  See Zimmerman v. Burge, No. 9:06-CV-0176, 2009 WL 3111429, at *8 (N.D.N.Y. Sept. 24, 2009) (Sharpe, J. & Lowe, M.J.) (prisoner who was denied admission to a prison mental health program suffered from a serious medical need in light of his history of depression, suicidal ideation, and his later suicide attempt).

Subjective Element

Defendants argue that even assuming Risch suffered from a serious condition, there is no evidence that they were deliberately indifferent.  Defendants are correct.  The progress notes indicate that plaintiff routinely denied suicidal ideation, anxiety, or psychosis. Defendants cannot be held liable for disregarding conditions of which they could not possibly have been aware.  There is also nothing to support plaintiff's conclusory assertion that defendants conspired to provide inadequate treatment in response to his grievances.

Further, plaintiff was not denied access to mental health care.  Risch was prescribed an antipsychotic and an antidepressant from the time he arrived at Mid-State until June 2007.  After plaintiff was taken off these medications, defendants continued to monitor

- 14 -

his status, provided monthly therapy, consulted with a treatment team, and advised him to contact defendant Cheyne any time he felt additional counseling was needed.  Accordingly, there is insufficient evidence to establish that defendants acted with a culpable state of mind to satisfy the subjective element of the deliberate indifference claim.  Therefore, defendants' motion for summary judgment will be granted as it relates to plaintiff's claim that defendants Farago, Tourtelot, and Cheyne were deliberately indifferent to his mental health needs.

### 2.  Medical Needs

Plaintiff asserts that defendants Ramineni, Mannava, and Howard were deliberately indifferent to his medical needs by failing to provide timely and adequate treatment for his urinary tract infection and associated pain.

Objective Element

In his deposition, plaintiff claimed that he first reported his urinary tract problems to Dr. Ramineni in April 2006.  Plaintiff's Depo., at 17.  However, the medical records show that Risch complained of itchy skin, thyroid complications, elbow pain, and mental health concerns during this time period.  Complaint, Ex. A, Dkt. No. 1.  Moreover, the record indicates that Risch had not yet been transferred to Mid-State in April 2006, and Dr. Ramineni's name does not appear on any of the medical reports until October 2006.  Nevertheless, plaintiff was prescribed Cipro—an antibiotic used to treat urinary tract infections—in April 2006.  Id.; Ramineni Dec., Dkt. No. 54–5, ¶¶ 5, 11.

In his complaint, plaintiff asserts that he complained of painful urination on June 5, 2006, and was provided Naproxen for the pain.  Complaint, Dkt. No. 1, ¶ 39.  He further claims that on July 7, 2006, he informed a nurse, who is not a defendant in this action, that

- 15 -

the Naproxen was ineffective and claimed to suffer from "severe pain."  Id. at ¶ 40.  Plaintiff

does not identify who prescribed the Naproxen in June 2006, and there is nothing in the

medical records concerning this time period.

      Plaintiff claims that he advised defendants of his painful urination on October 19

and 21, 2006.  Id. at ¶¶ 41–42.  However, the earliest documented complaint of painful

urination in the medical record is on October 23, 2006.  Ramineni Dec., Ex. A, Dkt. No. 54–6.

Other than plaintiff's conclusory assertion, there is nothing in the record to suggest that

defendants Howard, Remineni, or Mannava knew of his urinary tract pain prior to October 23,

2006.  Therefore, these defendants cannot be held accountable for the alleged inadequate

treatment that took place prior to their involvement in plaintiff's medical care.[3]  Even though

pain associated with a urinary tract infection is arguably sufficiently serious to satisfy the

objective element, the care Risch received beginning on October 23, 2006, was more than

adequate to satisfy constitutional requirements.

      <u>Subjective Element</u>

      Even assuming that plaintiff suffered from extreme pain from June to October

2006, thus constituting a serious medical condition, there is no evidence that defendants

Howard, Remineni, or Mannava acted with deliberate indifference once they became aware

of his condition.  Plaintiff claims that defendant Mannava repeatedly ridiculed him and implied

that his painful urination was caused by homosexual activity.  See Complaint, Dkt. No. 1,

---

[3] To the extent that plaintiff is seeking to hold the municipal defendants liable for the alleged
inadequate treatment he received prior to October 23, 2006, such a claim would fail as he has not
established that a federally protected right was violated by a municipal policy, custom or practice, or
decision of a municipal policymaker.  See Monell v. Dep't of Soc. Servs. of N.Y.C., 436 U.S. 658, 690–91,
98 S. Ct. 2018, 2035–36 (1978).  There is no respondeat superior liability that would allow plaintiff to hold
the Department of Corrections or the Central New York Psychiatric Center liable for the actions of its
employees.  See id. at 691, 98 S. Ct. at 2036.

¶¶ 43, 46.  Plaintiff also maintains that defendant Remineni refused to treat him because he had filed a grievance.  Id. at ¶ 50.  While such conduct, if true, may be unprofessional, there is no evidence to support plaintiff's claim that defendants consciously ignored his complaints or refused to treat his condition.  On the contrary, Risch received a litany of tests and treatment beginning in October 2006.

On October 23, 2006, Dr. Ramineni reportedly prescribed plaintiff Doxazosin, which is used to treat prostate problems.  Ramineni Dec., Dkt. No. 54–5, ¶¶ 6–7.  A November 4, 2006, medical report shows that plaintiff was taking five prescription medications at that time.  Ramineni Dec., Ex. B, Dkt. No. 54–7.  In December 2006 plaintiff underwent a prostate exam, ultrasound, and was tested for venereal disease.  Ramineni Dec., Ex. C, Dkt. No. 54–8.  In his deposition, Risch acknowledged that defendants Ramineni and Mannava provided him with medication to numb his bladder and then performed "a whole mess of tests."  Plaintiff's Depo., at 18.

Plaintiff was also sent to an outside urologist, Dr. Haas, who performed additional tests—including a testicular ultrasound in November 2008—and prescribed Cipro and Levaquin (antibiotics).  Id. at 20–21; Ramineni Dec., Exs. D & E, Dkt. Nos. 54–9 & 54–10.  Plaintiff met with Dr. Haas four times, the most recent of which was February 10, 2009, when plaintiff was prescribed Neurontin to relieve pain.  Plaintiff's Depo., at 22–23.  Plaintiff claimed that the Neurontin "works fairly well."  Id. at 23.

In light of this array of testing and treatment plaintiff received, it cannot be argued that these defendants acted with a culpable state of mind.  Accordingly, defendants' motion for summary judgment will be granted as it relates to plaintiff's claim that defendants Howard, Remineni, and Mannava were deliberately indifferent to his medical needs.

### E.  Retaliation/Conspiracy Claim

Although not specifically alleged in his complaint, Risch suggests at numerous times in the record that defendants conspired to intentionally deprive him of adequate medical care in response to his filing of administrative grievances and state court actions. Such a claim necessarily fails because plaintiff has not established that defendants violated any constitutional right.  See Young v. County of Fulton, 160 F.3d 899, 904 (2d Cir. 1998) ("There was no deprivation of a federal constitutional right, and therefore there can be no civil rights conspiracy to deprive that right.").

### F.  Qualified Immunity

Since plaintiff cannot establish that his constitutional rights were violated, "there is no necessity for further inquiries concerning qualified immunity."  Los Angeles County v. Rettele, 550 U.S. 609, 616, 127 S. Ct. 1989, 1994 (2007) (quoting Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156 (2001)).

## IV.  CONCLUSION

Plaintiff has failed to establish that an issue of material fact exists.  Although the evidence, when viewed in the light most favorable to Risch, shows that his mental health and medical conditions were objectively serious, there is insufficient evidence to establish that any of the defendants knew of and disregarded an excessive risk to his health or safety. Moreover, defendants Hulihan, Hogan, and Chapple were not personally involved in the alleged violative conduct.

Accordingly, it is

ORDERED that

1. Defendants' motion for summary judgment is GRANTED as to all claims; and

2. Plaintiff's complaint is DISMISSED in its entirety.

The Clerk of the Court is directed to enter judgment accordingly.

IT IS SO ORDERED.

_____
United States District Judge

Dated:   December 29, 2010
         Utica, New York.